

## NUMBER 13-08-00684-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

---

**MARTHA VASQUEZ,**                                      **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                     **Appellee.**

---

### On appeal from the 36th District Court of San Patricio County, Texas.

---

## MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Garza and Benavides
### Memorandum Opinion by Chief Justice Valdez

Appellant, Martha Vasquez, was charged by indictment with one count of intentionally or knowingly causing an injury to a child by act or omission, a first-degree felony. *See* TEX. PENAL CODE ANN. § 22.04(a)(1), (c)(1), (e) (Vernon Supp. 2010). After a trial, the jury convicted Vasquez of the underlying offense and sentenced her to

eighteen years' in the Institutional Division of the Texas Department of Criminal Justice with a $2,000 fine. By three issues, Vasquez argues that: (1) the jury charge did not instruct the jury on the correct mental state required to convict in this case and, thus, caused reversible error; (2) her trial counsel provided ineffective assistance by failing to object to the indictment and the allegedly infirm jury charge; and (3) the evidence is insufficient to support her conviction. We affirm.

## I. BACKGROUND

This appeal pertains to the death of two-year-old Justin Fellers. Vasquez and her boyfriend, Brian Fellers, were charged by indictment with the following:

> **MARTHA VASQUEZ and BRIAN FELLERS, acting alone and together**, on or about the 7th day of November A.D. 2007 . . . did then and there intentionally or knowingly, by act or omission, cause serious bodily injury to Justin Fellers, a child 14 years of age or younger, by failing to seek medical treatment for the said Justin Fellers for blunt force trauma, and the defendant **MARTHA VASQUEZ** had assumed care, custody, or control of said child . . . .

(Emphasis in original).[1] A San Patricio County jury heard testimony from numerous witnesses testifying for the State, Vasquez, and Brian over the course of five days.[2] The witness testimony is summarized below.

### A. The State's Evidence

Justin is the biological child of Brian and his ex-wife, Tiffany Fellers. Justin and his three-year-old brother, Matthew, lived with Vasquez and Brian at the time of Justin's death. However, for a time, Justin and Matthew were placed with Tiffany's mother, Victoria Poulin, after Child Protective Services ("CPS") removed the children from Brian

---

[1] In a companion case, this Court affirmed Brian's conviction for the same offense. *See Fellers v. State*, No. 13-08-688-CR, 2010 Tex. App. LEXIS 4792, at *1 (Tex. App.–Corpus Christi June 24, 2010, no pet.) (mem. op., not designated for publication).

[2] Vasquez and Brian were tried together.

and Tiffany's home after Tiffany allegedly left Justin home alone.[3]  Poulin testified at trial as to the upbringing of the children and the relationship between Justin and Matthew. Poulin noted that Justin was only seven months old and very developmentally behind when he came into her care.  Poulin recalled that Justin and Matthew had a very good relationship, that they played well together, and that they never had a problem playing together or with another child in the household, Tyler.  Poulin did not recall Justin having a problem with bruising.  Poulin also testified that Vasquez called her several times while the children were in Poulin's custody.  Vasquez allegedly said, "that she did not want the kids [Justin and Matthew]; she was not going to raise those kids.  She was not raising her own daughter,[[4]] and if Brian brought those kids, she was going to leave him."  Vasquez also tried to persuade Poulin to skip a scheduled child support hearing involving Justin and Matthew.  Poulin also testified that she viewed Justin's body at the hospital and noticed that he had "bruises from the top of his buttocks almost to the bottom of his knees, across both legs and a great, big welp [sic] on his back."[5]  Poulin attended Justin's funeral and noticed that Vasquez appeared to be angry.  Vasquez "had her arms crossed the whole time and just had this very angry look on her face."

Kristin Shirley testified that she babysat Justin and Matthew during the weekdays from November 2006 to September 2007, just two months before Justin's death and while the children were still in Poulin's custody.  Shirley stated that Justin and Matthew were "protective of each other" and that they played well together.  Shirley only recalled

---

[3] Brian obtained custody of Justin and Matthew from Poulin on September 20, 2007.

[4] At the time, Vasquez had one biological daughter, Fernanda.

[5] Upon viewing Justin's body, Poulin asserted that Vasquez and Brian had beaten Justin to death. Brian allegedly responded that "he could discipline his children anyway he wanted."

3

Justin having "typical child" bruises on his "shins or something in that area." Shirley did not believe that either Justin or Matthew easily bruised. She also did not recall seeing Justin or Matthew injuring themselves when they were angry.

Stephanie Pierce, a caseworker for Bay to Bay Early Childhood Intervention and Coastal Plains MH-MR, testified that Vasquez called for help regarding Justin's speech. Pierce contacted Vasquez and asked her about Justin's development. Vasquez expressed a desire to enroll Justin in counseling services because Justin and Matthew "were having some difficulties." In particular, Vasquez expressed that Justin and Matthew "scratched and hit themselves in the face and arms." Pierce then visited the Vasquez house to meet with Vasquez and the children. Upon arriving, Vasquez disclosed that she was having "problems with potty training," though she did not elaborate further on the problems. She noted that her biological daughter was potty trained when she was twelve months old. Pierce expressed to Vasquez that potty training is a very stressful time for parents and relayed that she had been involved in investigations where parents killed their children while trying to potty train them. Vasquez revealed that Matthew and Justin ate a lot. Pierce suggested that Vasquez take the children to visit a pediatrician and a child psychiatrist about these problems; however, Vasquez stated that the children had not "seen a pediatrician since they had been in the custody of [Brian]" and that "she felt she wasn't able to take them to the pediatrician because she was their dad's girlfriend rather than their guardian." Pierce also observed the children play together, and she noted that they appeared to have a bond and neither child was aggressive towards the other. Pierce did notice that Justin had "small, circular, green, yellow; like old bruises" on either side of his lips and his

4

lower cheek. Towards the end of their meeting, Vasquez expressed a concern about CPS's continued involvement in reviewing Justin and Matthew's placement. Pierce then described a meeting she had with Vasquez and the children on November 5, 2007, two days prior to Justin's death. Pierce recalled that the boys were wearing short-sleeved shirts and shorts; that Justin did not have any visible bruises besides a few on his face; and that it did not appear that the boys had been abused. When shown pictures taken during Justin's autopsy, Pierce testified that Justin's facial bruises in the pictures were worse than the bruises she saw at the November 5, 2007 meeting.

Pierce returned to the Vasquez house when she learned that Justin had died. Upon arriving, she first spoke with Angelica Vasquez, Vasquez's younger sister. Angelica "was flushed and breathing hard and her speech was rapid." Pierce described Angelica's reaction to Justin's death as "bewildered." Pierce did not speak to Vasquez until the next day, when she came to the Vasquez house unannounced. When speaking to Vasquez, Pierce noticed that Vasquez was not crying and did not appear emotional about Justin's death. Vasquez then recounted the following to Pierce regarding what had happened the night before Justin's death:

> She [Vasquez] said that the morning of the [6]th they got up and followed their regular routine, which is to get up early and get Brian to work. And she said that it was a regular day until about 6:00 P.M. And she said Justin had eaten fish sticks during mealtime and had a corn dog later and she said he just began throwing up. And he was taken to the potty and had to be cleaned up. That even while he was being cleaned, he still clung to his corn dog. They went to the house in Sinton[6] . . . .

> She said that they were getting ready for bed and Justin continued to throw up.

---

[6] Vasquez and Brian apparently own a house in Sinton, Texas, that they were fixing up. On the night before Justin's death, the family traveled to the Sinton house and to Brian's parents' house to return a lawnmower. While traveling to these places, Justin threw up again.

5

When Pierce asked Vasquez why she did not take Justin to the emergency room or to the doctor after witnessing Justin repeatedly throw up, Vasquez said she was afraid the hospital staff would see a bruise on Justin's leg and would report her to CPS. Pierce noted that Vasquez only got emotional when talking about CPS possibly taking her biological daughter, Fernanda, away from her.

The following day, November 9, 2007, Vasquez called Pierce's office and told her that Justin's "autopsy came back clean. She said that there are no bruises and that they were waiting for the toxicology report." Vasquez called Pierce a few days later and told Pierce that the police were going to contact her and asked if Pierce was aware of this. However, Vasquez later informed Pierce that the police said that Justin had bruises all over his body and that she was offered a plea bargain. Vasquez told Pierce that "she cries every day" about Justin's death. Both of these unsolicited calls made Pierce very uncomfortable and angry; she felt that Vasquez was trying to manipulate the situation. Vasquez then called Pierce again, and Pierce testified that Vasquez seemed upset that Pierce had spoken to the police about their interactions.

Thelma Gutierrez, an investigative supervisor for CPS, testified that CPS opened its case regarding Justin in August 2007, and closed the case in late October 2007. When Justin was taken to the hospital, Gutierrez was informed, and she immediately traveled to the hospital. When she first arrived, Gutierrez saw Vasquez and Brian and noticed that Vasquez was neither crying nor emotional. Gutierrez asked Vasquez what had happened, and Vasquez told Gutierrez the same story that was later relayed to Pierce. Vasquez also disclosed that Justin had only vomited four times the night before his death and that he began convulsing at 7:00 a.m. on November 7, 2007. Regarding

6

the bruises that were visible when Justin was taken to the hospital, Vasquez explained that the bruises were caused by other kids; that Justin bruised easily; that she and Brian had stopped spanking Justin two weeks prior to his death; and that Justin would often pinch his own cheeks. In speaking with Vasquez, Gutierrez was surprised that Vasquez did not show any emotion and was "very matter-of-fact." Later, Gutierrez spoke with Brian, who appeared to be emotional about Justin's death and recounted the same story and explanations as Vasquez. Gutierrez then testified that after Justin's death, Matthew was taken to Driscoll Children's Hospital for examination. The results of the examination revealed that Matthew had bruising across his buttocks and his thighs, and he had "some circular bruising." Nevertheless, Matthew was returned to the Vasquez home with a safety plan in place; however, he was officially removed and taken into CPS custody a day later.

Karen Diaz, a Justice of the Peace for Precinct 4 in San Patricio County, testified that she was dispatched to the hospital on the morning of November 7, 2007, to determine whether an autopsy should be conducted on Justin. When examining Justin's body, Judge Diaz was surprised by the amount of bruising. She recalled that Justin had a bruise on the top of his head, bruises to his abdomen, bruises on his face, and many others that were different colors. Judge Diaz touched Justin and determined that he had likely been dead for "more than a few hours." Judge Diaz thought it was odd that Justin was wearing pants and a long-sleeved shirt with a hood becuase the weather was quite warm on November 7. Judge Diaz then spoke to Vasquez and Brian in the waiting room. Vasquez was calm and "very matter-of-fact," while Brian sat in the back of the room softly crying. Vasquez then recounted to Judge Diaz her story of what

7

had happened. Vasquez noted that at some point during the morning hours of November 7, Justin began having trouble breathing, and Vasquez picked him up, shook him, and had Angelica call 911. Vasquez also informed Judge Diaz that shortly after she and Brian got custody of Justin, he began complaining about a pain in his side; however, because Vasquez and Brian did not have insurance or Medicaid coverage, they declined to take Justin to the doctor for examination. Vasquez told Judge Diaz that Justin had been hand-spanked in the past and that other children would pick on Justin, even though "nothing out of the ordinary or unusual had happened." Vasquez denied abusing Justin.

Angela Fellers, Brian's sister-in-law, stated that she babysat Justin and Matthew on occasion and that neither Justin nor Matthew played excessively roughly with each other. Angela saw that the boys had a good relationship and played well together. In addition, Angela did not notice that Justin or Mathew bruised easily; however, she did remember seeing bruises on Justin. Justin had some bruises on his face, and when Angela asked Vasquez about those bruises, Vasquez stated that Fernanda had hit Justin with a toy. On one occasion, Vasquez asked Angela to watch the boys on the weekend before Halloween 2007, which Angela agreed to do. Vasquez told Angela to keep a close eye on Justin because he was having a problem with falling. Angela recalled Vasquez also telling her that Justin had a pain in his side. Angela told Vasquez that she should take Justin to the doctor to examine the pain in his side and his tendency to fall, to which Vasquez responded that she was waiting to qualify for Medicaid. In response to this statement, Angela told Vasquez that Driscoll Children's Hospital in Corpus Christi, Texas, did not require Medicaid or insurance to treat

8

children. Vasquez once again responded that she was waiting to qualify for Medicaid. After Justin's death, Angela was subpoenaed, and she spoke with the district attorney's office. After doing so, Vasquez contacted Angela asking why she was subpoenaed and advising her to not talk to anyone about Justin. Angela felt uncomfortable about Vasquez calling her and advising her to not talk to anyone about Justin because she and Vasquez were not close.

Courtney Schweizer, girlfriend to Angela's son, testified that she was at Angela's house for the weekend of Halloween 2007, when Angela was babysitting Justin and Matthew. Schweizer watched Justin and Matthew play well together. She believed they had a bond. Schweizer only recalled Justin having a bruise on his stomach and a bruise on his head. Schweizer recalled Vasquez telling her that Justin "would get a lump on one side of his stomach sometimes." Schweizer also asked Vasquez why she had not taken Justin to the doctor to examine his alleged problems, and Vasquez stated that she was waiting until a bruise on Justin went away. When shown a picture of Justin's condition at the time of his death, Schweizer testified that she would have taken him to the hospital earlier. Like Pierce and Angela, Schweizer was also contacted by Vasquez after investigators mentioned that they would like to talk to Schweizer. Vasquez tried to discourage Schweizer from talking to investigators. Nevertheless, Schweizer spoke with investigators, and after doing so, Brian called her and angrily stated that it was Schweizer's fault that Angela and several others had been subpoenaed. On cross-examination, Schweizer recounted an incident where Tiffany called and threatened to kill Schweizer if she did not talk to investigators about Justin.

9

Tiffany testified about a phone call she received from Brian regarding Justin's condition on November 7. Brian told Tiffany that:

> He [Brian] was at work the day before and that he came home and [Vasquez] said that he—that Justin had been throwing up and that she [Vasquez] just thought [Justin] had the flu or something and that he didn't eat his dinner. And Brian told me that they stayed up like all night to watch Justin and he threw up several times and they kept giving him a bath. And then they put him to sleep. And then that Brian woke up and checked on [Justin] before he went to work and that [Vasquez] called him while he was on his way to work and said that Justin was using the bathroom and stopped breathing.

Regarding the bruises that were visible on Justin's body on the day of his death, Tiffany stated that Brian told her that: "he didn't realize the bruises were as bad as they were until he saw them at the hospital because [Vasquez] was the one that always gave [Justin] a bath and changed his clothes and stuff." Tiffany attended Justin's funeral and remembered seeing Vasquez with "her arms crossed and she just looked mad." Tiffany never saw Vasquez crying about Justin's death.

Russell Kirk, an investigator for the San Patricio County District Attorney's Office, testified that on November 14, 2007, he interviewed Vasquez about Justin's death. At this interview, Vasquez was upset and crying. Kirk further testified that Brian told him that some of the bruises on Justin's buttocks were from spanking, and Vasquez stated that Justin's bruises on his head were caused while playing with other kids.

Courtney Greer, Angelica's twenty-year-old husband, and Angelica testified that they lived at the Vasquez house with Vasquez, Brian, Justin, Matthew, Vasquez's brother, Angel Vasquez Jr., Fernanda, and Vasquez's parents. Both Greer and Angelica recalled seeing Justin throw up at least three different times on the night before his death. Greer stated that Justin appeared to be only a "little uncomfortable."

Greer recalled hearing Brian and Vasquez say that they would take Justin to the doctor in the morning if Justin was still not feeling well. Angelica believed that Justin was "normal," though she did volunteer to stay up all night with Justin despite her school and work responsibilities the next day. Greer noted that Justin drank a lot of water on the night before his death, and because Justin was sick, both Greer and Angelica prayed for Justin to feel better. Greer testified that he only saw a bruise on Justin's forehead and a scratch on Justin's face on the night before Justin died. Greer stated that the scratch was caused by Justin when he "got flustered over something" and that the bruise was caused by Justin tripping down some stairs and hitting his head on concrete.

The following morning, Vasquez brought Justin into the bathroom while Greer was showering. At that time, Justin was in his diaper and appeared to be limp. Greer saw that Justin's eyes were open and that Justin was pale. Angelica and Greer took Justin to Angelica's room and laid him on Angelica's bed. While Angelica and Greer were tending to Justin, Vasquez was calling 911. Justin was struggling to breathe and his extremities were cold. Greer then attempted to resuscitate Justin. Greer testified that he asked Angelica to bring Justin some clothes while he was trying to breathe into Justin's mouth. Greer continued to breathe into Justin's mouth until paramedics arrived.

On cross-examination, Greer acknowledged that Justin and Matthew played well together, though they occasionally wrestled. Greer also recalled that on the night before Justin's death, Vasquez and Brian gave Justin some "Mejoralitos," which were described as children's Tylenol from Mexico. Greer noted that he did not think Justin's condition was serious enough on the evening of November 6 to warrant taking him to

11

the emergency room. Greer testified that everyone in the house was upset about Justin's condition. Greer never saw Vasquez discipline the children, but he admitted that he swatted their hands "once or twice."

Angelica echoed Greer's testimony regarding the events of November 6 and 7, though she did note that Vasquez and Brian did not appear to be worried that Justin was throwing up repeatedly the night before his death. She later contradicted her testimony and stated that Vasquez appeared to be worried about Justin's throwing up. Angelica recalled that most of Justin's vomit was clear. Angelica testified that she was worried about Justin's condition throughout the whole ordeal. Regarding the disciplining of Justin and Matthew, Angelica recalled that Brian spanked the children and that Vasquez would threaten the children by saying, "[i]f you keep on being bad, your dad is going to spank you." Angelica remembered seeing Justin scratch himself when he would get mad. Angelica stated that on November 6, Justin did not have most of the bruises that were observed at the hospital the next day.

Angel Vasquez Jr., Vasquez's brother, stated that Justin was breathing normally on the morning of November 7, when 911 was called. Angel Jr. testified that Vasquez was trying to potty train Justin at the time of his death and that Justin was having a hard time with the training. Angel Jr. recalled seeing a bruise on Justin's face prior to his death, but he denied seeing any other bruises. Shirley Fellers, Brian's mother, testified that Brian, Vasquez, and the children visited on the evening of November 6, when Brian returned her lawnmower. Only Brian came into the house that evening, and Shirley remembered that Brian was upset because Justin was sick. Brian told Shirley that Justin had thrown up and that Vasquez was cleaning up. Brian left Shirley's house

12

shortly thereafter. Shirley saw Brian and Vasquez again at the hospital the next morning. Shirley saw Brian crying in the waiting room, but she noticed that Vasquez was not crying. Shirley was shocked to see the number of bruises on Justin's body at the hospital. She recalled that Justin and Matthew had visited about a week earlier and that Justin did not have any bruises at that time.

Marcus Menchaca, a dispatcher with the San Patricio County Sheriff's Office, testified that he received two emergency calls from Vasquez on the morning of November 7. At approximately 7:00 a.m. on November 7, Menchaca received a call from Vasquez, but Vasquez hung up before Menchaca could get any information from her. Menchaca then immediately called the phone number back, and a female voice, later identified as Vasquez's, answered. Menchaca described the tone of the female's voice as "slightly hysterical but she wasn't insane; she wasn't crazy. . . . She was shooken [sic] up. She sounded upset. She sounded slightly upset at first. . . . She was very panicky." Vasquez first relayed to Menchaca that Justin was having seizures, though Menchaca did not hear a crying baby in the background. Vasquez changed her story later in the conversation to indicate that Justin was throwing up and choking. About thirty seconds later, Vasquez checked on Justin and told Menchaca in a monotone voice that, "Okay. My baby is fine. He looks okay now." Menchaca was surprised by Vasquez's change in demeanor. He thought that Vasquez no longer cared about Justin's condition. Despite Vasquez's assertion that Justin was okay, Menchaca dispatched Officer Hankins and paramedics to the Vasquez house. Menchaca did not believe Vasquez's statement that everything was fine; he believed that "something [was] not right" and that Vasquez's emergency calls were "weird."

13

Shortly after 7:00 a.m., Alex Hankins, a police officer with the Gregory Police Department, arrived at the Vasquez house to find Justin "lying on a bed. He appeared deceased already. The skin was grayish looking, his eyes opened partially—he looked real stiff." Officer Hankins touched Justin's foot, but Justin did not move or flinch in response. Officer Hankins waited with the family until paramedics Steve Knight and Rachel Grumbles arrived. Upon viewing Justin's naked body in the hospital, Officer Hankins noticed "a lot of marks . . . [a] lot of bruises" on the body. On cross-examination, Officer Hankins recalled seeing Vasquez and Brian crying at the house; however, Officer Hankins testified that their crying "didn't look real."

Knight and Grumbles recalled that no one in the family seemed upset or hysterical when they arrived to treat Justin. Knight testified that Justin: (1) was not breathing; (2) never responded; and (3) never made visual contact. Moreover, Justin's "eyes were slightly open and they looked like they were kind of starting to dry out a little bit," meaning Justin had "been down for quite a while." Grumbles noticed that Justin was not breathing and that he was pale. Justin never cried or made any noises and his eyes contained "dry mucus." When Knight and Grumbles removed Justin's shirt to give begin CPR, they observed "quite a bit of bruising." Knight commented that "something didn't feel right with this call." Grumbles noted that Justin had bruises "[f]rom his head all the way down to his feet," which Grumbles described as the worst case of bruising that she had seen.

Patricia Woodruff, a registered nurse in the North Bay Hospital emergency room, testified that she was involved in the treatment of Justin at the hospital. Justin was brought to the hospital with no heartbeat or respiration. Nurse Woodruff recognized that

14

Justin had significant bruising all over his body, which Vasquez told her was caused by playing with other children. Once Justin was pronounced dead and his clothing was removed, Nurse Woodruff was surprised to see the extent of the bruising. Nurse Woodruff testified that the bruising to Justin's face was "suspicious" and the bruising to his buttocks was "worrisome." Regarding bruising to Justin's abdomen, Nurse Woodruff opined that "[i]t just seemed large, like it would have been a painful thing and not—Well, it just seemed unusual in the abdomen like that. Not like playing around . . . ." Nurse Woodruff, a mother and grandmother, stated that none of her children or grandchildren had ever sustained bruising as significant as she saw on Justin's body. On cross-examination, Nurse Woodruff acknowledged that they had a difficult time starting an IV on Justin and that Justin's blood was not tested.

Saiad Mustafa, M.D., an emergency-room doctor who treated Justin at the hospital, testified that he observed paramedics intubating Justin and giving Justin chest compressions as Justin was brought into the emergency room. Justin was not breathing and did not have a heartbeat. In an attempt to revive Justin, nurses had to use an intra-osseous IV injected in Justin's leg. Dr. Mustafa commented that an intra-osseous IV is commonly used with children because it is very difficult to start an IV through a child's veins because the veins are so small. After many unsuccessful efforts to revive Justin, Dr. Mustafa pronounced Justin dead at 7:41 a.m. on November 7, a death which Dr. Mustafa described as "suspicious." Dr. Mustafa denied that any kind of infection could have caused the bruises and abrasions found on Justin's body at the time of his death or that Justin had meningitis. In addition, Dr. Mustafa testified that none of the life-saving measures taken by medical staff could have caused the injuries

15

to Justin's abdomen. On cross-examination, however, Dr. Mustafa stated that it may have been reasonable for Vasquez and Brian to not immediately seek medical assistance if Justin had vomited only three or four times and had not vomited up any blood.

The medical examiner, Ray Fernandez, M.D., testified that he conducted the autopsy of Justin and that he was unable to pinpoint the exact time of Justin's death. Dr. Fernandez stated that the cause of death was "blunt force abdominal injuries." Based on the cause of death, Dr. Fernandez determined that Justin received the fatal injury between twelve and seventy-two hours before his death, which would have been between Sunday, November 4, 2007, and November 7. Dr. Fernandez found food contents in Justin's stomach, which demonstrated that Justin ate between two and four hours before his death and meant that Justin likely died sometime during the evening hours of November 6. Dr. Fernandez also saw that Justin had:

> a two-inch area where there was bleeding just below the pancreas. And in that center of that area, there was a tear that was about a quarter of an inch tear of that tissue. The cavity, the belly itself, contained a large amount of green-tan fluid. It had 275 cc's of fluid there. Normally, there's no fluid at all free in that cavity. . . .
>
> There was an indication that there was an inflammation going on in the abdomen, fluid was building up in the abdomen. There was trauma inside the belly and then inflammation with fluid and pus that was building up in the abdomen.

The buildup of the fluid in Justin's abdominal cavity happened "over some period of time." As a result of this buildup, Dr. Fernandez testified that an individual would be pale and may have stomach pains. According to Dr. Fernandez, once "the body can't compensate for that fluid loss. Then they go into a coma, pass out. It's hard to arouse

16

them. And then their blood pressure goes down, their respiratory, their breathing goes down, and their heart stops." Dr. Fernandez disputed any insinuations that Justin died of meningitis or that he suffered from a blood disorder, such as sepsis.[7] Dr. Fernandez observed trauma to both sides of Justin's abdomen, which was consistent with more than one injury to Justin's abdomen. Dr. Fernandez described the amount of force necessary to create the injuries observed to Justin's abdomen as: "[t]his is a forceful injury. The type of force you see is usually from a car crash, see it from falling from a second story . . . ." Dr. Fernandez testified that Justin's abdominal injuries were not consistent with falling out of a bed, another child hitting Justin, or falling on the handlebars of a tricycle, unless the tricycle was hit by a moving pickup truck. Dr. Fernandez then noted that Justin had "numerous abrasions, numerous contusions" on his body and that he had bleeding in his head "between the bone and the scalp," though the head trauma that Justin sustained was not a "fatal-type injury." Dr. Fernandez also explained that a person cannot bruise after death. Regarding when the blunt-force injuries occurred, Dr. Fernandez opined that it likely occurred between lunch and dinner of November 6. Dr. Fernandez also noted that Tylenol was not found in Justin's system at the time of the autopsy, though on cross-examination, he acknowledged that the body typically metabolizes Tylenol within several hours.

As a rebuttal witness, the State called Nancy S. Harper, M.D., the medical director for the Child Abuse Resource and Evaluation Team at the Driscoll Children's Hospital, to testify. Dr. Harper noted that the bruises that Justin sustained were not consistent with the bruising that children often sustain while playing. Dr. Harper testified that it appeared that many of the bruises on Justin's face were caused by an adult

---

[7] Dr. Mustafa described sepsis as "blood poisoning" where "bacteria [is] growing in the blood."

17

forcibly grabbing Justin's cheeks to get his attention. Dr. Harper noted that had Justin been brought to the hospital for treatment sooner, his injuries could have been treated properly and he would likely still be alive. Dr. Harper noticed that the bruises on his inner thighs and buttocks had linear patterns consistent with being hit with "belts" or "looped cords." These bruises were "multi-plan[a]r" and not consistent with "normal childhood activity" but with "child abuse." Dr. Harper also opined that the abdominal injuries suffered by Justin were in uncommon locations in the abdomen. Dr. Harper stated that Driscoll Children's Hospital "will treat anyone regardless of insurance status."

On cross-examination, Dr. Harper denied that all of the bruises on Justin's body could have been caused by the life-sustaining measures taken by paramedics and doctors in the emergency room. She did acknowledge, however, that some bruising in the chest and face could occur from intubation. Dr. Harper further testified that "[a] tummy ache from trauma" and a "tear in the mesentery is not a virus" but rather a very serious injury that should be rushed to the emergency room.

## B. Vasquez's Evidence

Charles Harvey, M.D., a retired forensic pathologist who previously worked as a pathologist in Galveston, Texas, testified that he does not believe that the manner of Justin's death can be determined. Dr. Harvey acknowledged that he based his testimony solely on photographs taken during Justin's autopsy. Dr. Harvey counted that Justin had twenty-three bruises and fourteen abrasions at the time of his death. Dr. Harvey explained that the bruising on Justin's buttocks was likely caused by spanking by a hand. Dr. Harvey then testified that Justin likely had a blood disorder, which caused him to bleed easily and suggested that Justin may have had sepsis.

18

Dr. Harvey denied that the injuries to Justin's abdomen were caused by a disease or disorder. He did note, however, that he did not believe that Justin's death should be considered a homicide. Moreover, relying on a study conducted in the *Official Journal of the American Academy of Pediatrics*, Dr. Harvey stated that Justin's abdominal injuries may have been caused by low-energy trauma, such as falling on the handlebars of a tricycle. Dr. Harvey disagreed with Dr. Fernandez's testimony that Justin's abdominal injuries could only have been caused by a "high velocity" trauma.

John Gilbert Glanasnik, M.D., a staff physician at the University of Alabama-Tuscaloosa, testified that it did not appear that Justin was abused. Dr. Glanasnik did not believe that it was unreasonable for Vasquez and Brian to wait until the morning of November 7 to take Justin to the doctor for treatment. Dr. Glanasnik concurred with Dr. Harvey's opinion that Justin likely suffered from a blood disorder, which caused the excessive bruising, and that Justin's abdominal injuries may have been caused by a "low-energy impact force to the abdomen."

On cross-examination, Dr. Glanasnik admitted that he has testified solely on behalf of defendants in approximately thirty different trials and that he relied solely on the autopsy photographs to arrive at his opinions.

Angel Vasquez Sr., Vasquez's father, testified that Justin and Matthew would play together and that they would play with games, toys, and tricycles. Angel Sr. recalled only seeing one bruise on Justin's cheek and one bruise on his buttocks on November 6. Angel Sr. denied ever seeing Brian spank the children, but he did see Brian scold Justin and Matthew. Angel Sr. testified that he believed Justin required medical treatment on November 6 because he appeared to be "unnourished." He later

19

recanted and stated that he did not believe that Justin should have gone to the hospital because he did not know what was causing Justin to vomit. Angel Sr. admitted that he and his wife primarily raised Fernanda and a daughter that Vasquez and Brian had subsequent to Justin's death.

## C. Procedural History

At the conclusion of the testimony, the parties agreed on a charge to submit to the jury. Counsel for Vasquez did not object to the proposed charge. In fact, Vasquez expressed in open court that she was satisfied with the charge as submitted. The jury found Vasquez and Brian guilty of the charged offenses, and Vasquez was sentenced to eighteen years' incarceration in the Institutional Division of the Texas Department of Criminal Justice with a $2,000 fine. *See* TEX. PENAL CODE ANN. § 22.04(a)(1), (c)(1). Thereafter, Vasquez filed a motion for new trial, which was overruled by operation of law. *See* TEX. R. APP. P. 21.8(a), (c); *see also State v. Gutierrez*, 143 S.W.3d 829, 831 (Tex. App.–Corpus Christi 2004, no pet.). This appeal ensued.

## II.     THE INDICTMENT AND THE JURY CHARGE

In her first issue, Vasquez asserts that the trial court reversibly erred by failing to sua sponte charge the jury with an instruction limiting the specific mental state required to convict for causing serious bodily injury to a child by omission. Vasquez also argues that the indictment was fundamentally defective because it failed to allege "that [she] either knew to a reasonable certainty that the omission to seek medical treatment would cause serious bodily injury to the child or that she consciously intended that the omission to seek medical treatment would cause serious bodily injury to the child"; therefore, the indictment did not properly charge her with an offense. In particular, Vasquez contends that injury to a child is a result-oriented offense, which requires a

20

mental state that relates not to the means of committing the offense but to the result of the conduct.

## A. The Language Contained in the Indictment

In the instant case, Vasquez's trial counsel did not file a motion to quash the indictment alleging the infirmities that are raised on appeal. However, in *DeLeon v. State*, 684 S.W.2d 774, 778 (Tex. App.–Corpus Christi 1984, no pet.) (en banc) (per curiam), this Court held that "[i]f the defect in the charging instrument is of such a degree as to charge no offense against the law, it is void or fundamentally defective and such a defect may be considered for the first time on appeal." Therefore, even though Vasquez did not file a motion to quash the indictment in the trial court, we must examine the language contained in the indictment to determine whether an offense was properly alleged. *See id.*

Whether an indictment is sufficient is a question of law that we review de novo. *See State v. Moff*, 154 S.W.3d 599, 601 (Tex. Crim. App. 2004). We construe an indictment by reading it as a whole and applying practical rather than technical considerations. *Harrison v. State*, 76 S.W.3d 537, 539 (Tex. App.–Corpus Christi 2002, no pet.) (citing *Oliver v. State*, 692 S.W.2d 712, 714 (Tex. Crim. App. 1985) (en banc); *Soto v. State*, 623 S.W.2d 938, 939 (Tex. Crim. App. 1981)). "A written instrument is an indictment or information under the Constitution if it accuses someone of a crime with enough clarity and specificity to identify the penal statute under which the State intends to prosecute, even if the instrument is otherwise defective." *Teal v. State*, 230 S.W.3d 172, 176 (Tex. Crim. App. 2007) (internal quotations omitted). If the indictment

> charges the commission of the offense in ordinary and concise language
> in such a manner as to enable a person of common understanding to
> know what is meant, and with that degree of certainty that will give the

21

> defendant notice of the particular offense with which he is charged, and enable the court, on conviction, to pronounce the proper judgment,

then the indictment is sufficient. TEX. CODE CRIM. PROC. ANN. art. 21.11 (Vernon 2009). Generally, a charging instrument that tracks the language of a criminal statute is sufficiently specific to provide a defendant with notice of a charged offense. *State v. Edmond*, 933 S.W.2d 120, 128 (Tex. Crim. App. 1996) (en banc); *DeVaughn v. State*, 749 S.W.2d 62, 67 (Tex. Crim. App. 1988) (en banc); *see Trevino v. State*, 228 S.W.3d 729, 734 (Tex. App.–Corpus Christi 2006, pet. ref'd).

The indictment in this case essentially tracks the language of the penal code for the felony offense of injury to a child. *See* TEX. PENAL CODE ANN. § 22.04(a)(1).[8] The indictment includes some additional language regarding the means in which the offense was committed—i.e., "by failing to seek medical treatment for the said Justin Fellers for blunt force trauma"—and fails to specify that Vasquez could have committed the charged offense recklessly or, in other words, with a less culpable mental state. Instead, the indictment alleged that Vasquez could have only committed the charged offense "intentionally or knowingly." Though the indictment does not track the language of section 22.04(a)(1) word-for-word, we cannot say that the exclusion of the "recklessly" intent level failed to apprise Vasquez of the charged offense. In fact, the indictment charged that Vasquez "intentionally or knowingly" committed the offense rather than "recklessly," a less culpable mental state.

In addition, we cannot say that the inclusion of additional language in the indictment regarding the manner and means of committing the offense prejudiced

---

[8] Section 22.04(a)(1) of the penal code provides that a person commits the offense of injury to a child "if he intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes to a child, elderly individual, or disabled individual . . . serious bodily injury." TEX. PENAL CODE ANN. § 22.04(a)(1) (Vernon Supp. 2010).

22

Vasquez's substantial rights. *See* TEX. CODE CRIM. PROC. ANN. art. 21.19 (Vernon 2009) ("An indictment shall not be held insufficient, nor shall the trial, judgment or other proceedings thereon be affected, by reason of any defect of form which does not prejudice the substantial rights of the defendant."); *see also Gollihar v. State*, 46 S.W.3d 243, 257 (Tex. Crim. App. 2001) (holding that a variance between the wording of the indictment and the evidence presented at trial is fatal only if "it is material and prejudices [the defendant's] substantial rights" and that when reviewing the variance, we must determine whether the indictment, as written, informed the defendant of the charge against him sufficiently to allow him to prepare an adequate defense at trial, and whether prosecution under the alleged deficient indictment would subject the defendant to the risk of being prosecuted later for the same crime); *Geter v. State*, 779 S.W.2d 403, 405-06 (Tex. Crim. App. 1989) (concluding that if a statutory term provides for more than one manner or means to commit the act or omission, then, upon a timely request, the State must allege the particular manner or means it seeks to establish).

Here, Vasquez did not timely request that the State allege the particular manner or means for committing the offense. Nevertheless, the State included the specific manner and means to commit the offense—failure to seek medical treatment—in the indictment. We cannot say that the inclusion of the manner and means language precluded Vasquez from mounting an adequate defense or subjected her to additional prosecution for the same crime, especially in light of testimony characterizing Justin's abdominal injuries as the only "blunt-force trauma" that ultimately caused his death, and testimony that, had Vasquez sought medical treatment for Justin earlier, Justin likely would have survived his injuries. *See Gollihar*, 46 S.W.3d at 257. In addition, the

23

inclusion of language addressing section 22.04(d)—the section of the injury-to-a-child statute imposing a duty on non-parents to act reasonably in procuring, among other things, medical care for the child—in the indictment provided notice to Vasquez that she had a duty to provide medical treatment for Justin. *See* TEX. PENAL CODE ANN. § 22.04(d) ("For purposes of an omission that causes a condition described by Subsection (a)(1) . . . the actor has assumed care, custody, or control if he has by act, words, or course of conduct acted so as to cause a reasonable person to conclude that he has accepted the responsibility for protection, food, shelter, and medical care for a child . . . ."). Based on the foregoing, we cannot say that Vasquez's substantial rights were harmed so as to render the indictment insufficient.

## B. The Language Contained in the Jury Charge

Before we closely examine the jury charge's language, we recognize that section 6.03 of the penal code delineates three "conduct elements" that may be involved in a crime: (1) the nature of the conduct; (2) the result of the conduct; and (3) the circumstances of the conduct. *See* TEX. PENAL CODE ANN. § 6.03 (Vernon 2003); *see also McQueen v. State*, 781 S.W.2d 600, 603 (Tex. Crim. App. 1989). Moreover, injury to a child is a result-oriented offense; therefore, the culpable mental state criminalized in section 22.04 contemplates only the prohibited result—here, serious bodily injury to Justin. *See Haggins v. State*, 785 S.W.2d 827, 828 (Tex. Crim. App. 1990); *Alvarado v. State*, 704 S.W.2d 36, 39 (Tex. Crim. App. 1985); *Banks v. State*, 819 S.W.2d 676, 678 (Tex. App.–San Antonio 1991, pet. ref'd); *see also Martinez v. State*, No. 04-02-00491-CR, 2003 Tex. App. LEXIS 1031, at *3 (Tex. App.–San Antonio Feb. 5, 2003, no pet.) (mem. op., not designated for publication). It is error not to limit the definitions of culpable mental states in result-oriented offenses to the result of the accused's action.

24

*See Ventroy v. State*, 917 S.W.2d 419, 423 (Tex. App.–San Antonio 1996, pet. ref'd) (citing *Cook v. State*, 884 S.W.2d 485, 491 (Tex. Crim. App. 1994)); *see also Martinez*, 2003 Tex. App. LEXIS 1031, at *3. Because section 22.04 criminalizes a result-oriented offense, the trial court was required to limit culpable mental states in the abstract portion and the application portion of the jury charge to the result of the defendant's conduct. *See Cook*, 884 S.W.2d at 491; *Ventroy*, 917 S.W.2d at 423; *Skillern v. State*, 890 S.W.2d 849, 869 (Tex. App.–Austin 1994, pet. ref'd); *see also Martinez*, 2003 Tex. App. LEXIS 1031, at *3.

However, because she did not object to the charge as submitted, Vasquez has the burden of demonstrating egregious harm. *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984). In analyzing whether Vasquez satisfied her burden, we read the language of the charge in the context in which it appears, and we are not to read the charge's language selectively. *See Turner v. State*, 805 S.W.2d 423, 430-41 (Tex. Crim. App. 1991). Moreover, we must review the evidence and the record as a whole to determine if there was actual, rather than theoretical harm. *See Cook*, 884 S.W.2d at 491-92; *see also Martinez*, 2003 Tex. App. LEXIS 1031, at *4. For Vasquez to obtain a reversal for egregious harm, she must assert that the complained-of error was "fundamental" and that she was deprived of a fair and impartial trial. *See Almanza*, 686 S.W.2d at 171; *see also Stuhler v. State*, 218 S.W.3d 706, 719 (Tex. Crim. App. 2007) ("Jury charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory."); *Martinez,* 2003 Tex. App. LEXIS 1031, at *4. "The actual degree of harm must be determined in light of the entire jury charge, the state of the evidence, including

25

contested issues and the weight of probative evidence, the argument of counsel[,] and any other relevant information revealed by the record as a whole." *Martinez*, 2003 Tex. App. LEXIS 1031, at **4-5 (citing *Almanza*, 686 S.W.2d at 171).

On appeal, Vasquez directs us to the abstract portion of the charge where the jury was instructed as follows:

> A person who has assumed care, custody, or control of a child commits an offense if the person intentionally or knowingly by omission causes to that child serious bodily injury.
>
> . . .
>
> The actor has assumed care, custody, or control if she has by act, words, or course of conduct acted so as to cause a reasonable person to conclude that she has accepted responsibility for protection, food, shelter, and medical care for a child.
>
> . . .
>
> A person acts intentionally, or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result.[9]
>
> A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.[10]

In the application paragraph of the court's charge, the jury was instructed:

---

[9] Section 6.03(a) of the penal code provides that "[a] person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." TEX. PENAL CODE ANN. § 6.03(a) (Vernon 2003).

[10] Section 6.03(b) of the penal code provides that:

> A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

*Id.* § 6.03(b).

26

Now, bearing in mind the foregoing instructions, if you find from the evidence beyond a reasonable doubt that on or about the 7th day of November 2007[,] in San Patricio County, Texas, the defendant, Martha Vasquez, acting alone and together with BRIAN FELLERS, did then and there intentionally or knowingly, by act or omission, cause serious bodily injury to Justin Fellers, a child 14 years of age or younger, by failing to seek medical treatment for the said Justin Fellers for blunt force trauma, and the defendant MARTHA VASQUEZ had assumed care, custody, or control of said child, you will find the defendant guilty as charged in the indictment.

If you do not so find, or if you have a reasonable doubt thereof, you will find the defendant not guilty.

Elsewhere in the jury instructions, the trial court told the jury that, "You are the exclusive judges of the facts . . .of the credibility of the witnesses, and the weight to be given their testimony, but you must be governed by the law you shall receive in these written instructions." A single verdict form was submitted with the charge, allowing the jury to either convict Vasquez of injury to a child by omission, which the jury did, or to acquit her of the charged offense. No objection was made to the verdict form submitted.

A close reading of the jury charge shows that the trial court limited the definitions for the applicable culpable mental states of "intentionally" and "knowingly." The trial court excluded several portions of the statutory definitions for these culpable mental states, including portions addressing conduct-oriented offenses, and limited the definitions to the specific culpable mental states for a result-oriented offense. *See* TEX. PENAL CODE ANN. § 6.03(a), (b); *see also Fellers v. State*, No. 13-08-688-CR, 2010 Tex. App. LEXIS 4792, at **24-25 (Tex. App.–Corpus Christi June 24, 2010, no pet.) (mem. op., not designated for publication). Because the trial court limited the definitions of the culpable mental states for a result-oriented offense, we cannot say that the charge is

27

erroneous.  *See* TEX. PENAL CODE ANN. § 6.03(a), (b); *see also Fellers*, 2010 Tex. App.

LEXIS 4792, at **24-25.  As such, we overrule Vasquez's first issue.

### III.    INEFFECTIVE ASSISTANCE OF COUNSEL

In her second issue, Vasquez contends that her trial counsel was ineffective for

failing to object to the allegedly erroneous jury charge that was submitted and for failing

to object to the prosecutor's alleged misstatements of the law in closing argument.

### A.  Applicable Law

To establish ineffective assistance of counsel, Vasquez must show:  (1) her

attorney's representation fell below an objective standard of reasonableness; and (2)

there is a reasonable probability that, but for her attorney's errors, the result of the

proceeding would have been different.  *See Strickland v. Washington*, 466 U.S. 668,

684 (1984); *Dewberry v. State*, 4 S.W.3d 735, 757 (Tex. Crim. App. 1999) (holding that

appellant must show a reasonable probability that, but for counsel's errors, the fact-

finder would have had a reasonable doubt as to appellant's guilt); *Jaynes v. State*, 216

S.W.3d 839, 851 (Tex. App.–Corpus Christi 2006, no pet.).  Whether this test has been

met is to be judged on appeal by the totality of representation, not by any isolated acts

or omissions.  *Jaynes*, 216 S.W.3d at 851.  Vasquez has the burden of proving

ineffective assistance of counsel by a preponderance of the evidence.  *Thompson v.

State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999) (citing *Cannon v. State*, 668 S.W.2d

401, 403 (Tex. Crim. App. 1984)).

Our review of counsel's representation is highly deferential, and we will find

ineffective assistance only if Vasquez overcomes the strong presumption that her

counsel's conduct fell within the range of reasonable professional assistance.  *See

Strickland*, 466 U.S. at 689; *Jaynes*, 216 S.W.3d at 851.  The right to "reasonably

effective assistance of counsel" does not guarantee errorless counsel or counsel whose competency is judged by perfect hindsight. *Saylor v. State*, 660 S.W.2d 822, 824 (Tex. Crim. App. 1983). Moreover, the acts or omissions that form the basis of Vasquez's claims of ineffective assistance must be supported by the record. *Thompson*, 9 S.W.3d at 814; *Jaynes*, 216 S.W.3d at 851. A silent record which provides no explanation for counsel's actions usually will not overcome the strong presumption of reasonable assistance. *Thompson*, 9 S.W.3d at 813-14. To warrant reversal without affording counsel an opportunity to explain his actions, "the challenged conduct must be 'so outrageous that no competent attorney would have engaged in it.'" *Roberts v. State*, 220 S.W.3d 521, 533 (Tex. Crim. App. 2007) (quoting *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005)).

### B. The Jury Charge

On appeal, a portion of Vasquez's ineffective assistance of counsel claim is premised on a finding that the jury charge was erroneous and that she was deprived of a fair and impartial trial. Because we have concluded that the charge was not erroneous, Vasquez has failed to establish that any alleged ineffective assistance relating to the charge prejudiced her to such a degree that she was deprived of a fair trial. *See Strickland*, 466 U.S. at 684 (1984); *Dewberry*, 4 S.W.3d at 757; *Jaynes*, 216 S.W.3d at 851.

### C. The Prosecutor's Closing Argument

Permissible jury argument generally falls into one of four areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) an answer to the argument of opposing counsel; or (4) a plea for law enforcement. *Brown v. State*, 270

S.W.3d 564, 570 (Tex. Crim. App. 2008); *Berry v. State*, 233 S.W.3d 847, 859 (Tex. Crim. App. 2007).

> Even when an argument exceeds the permissible bounds of these approved areas, such will not constitute reversible error unless, in light of the record as a whole, the argument is extreme or manifestly improper, violative of a mandatory statute, or injects new facts harmful to the accused into the trial proceeding.

*Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000) (citing *Todd v. State*, 598 S.W.2d 286, 296-97 (Tex. Crim. App. 1980)).  "The remarks must have been a willful and calculated effort on the part of the State to deprive appellant of a fair and impartial trial."  *Id.* (citing *Cantu v. State*, 939 S.W.2d 627, 633 (Tex. Crim. App. 1997)).

Nevertheless, when analyzing any harm that may have been caused by an improper jury argument, we examine the following factors:  (1) the severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks); (2) measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge); and (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction).  *Ramon v. State*, 159 S.W.3d 927, 929 (Tex. Crim. App. 2004) (citing *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g)).

In analyzing the State's remarks during closing argument, we must not consider the statement in isolation; instead, we should review the closing arguments of both parties in order to determine the context in which the complained-of statements were made.  *See Wilson v. State*, 938 S.W.2d 57, 61 (Tex. Crim. App. 1996) ("The applicable legal standard of review is whether, in light of the record as a whole, there is a reasonable possibility the improper argument might have contributed to appellant's

conviction."); *see also Ozuna v. State*, 199 S.W.3d 601, 613 (Tex. App.–Corpus Christi

2006, no pet.) (holding that the complained-of jury argument is considered in light of the

record as a whole).

On appeal, Vasquez complains about the following statements made by the

prosecutor during closing argument:

> What I'm going to have to tell you; what I'm going to have to prove to you beyond a reasonable doubt; those certain elements. I don't have to prove they wanted him to die.
>
> . . . .
>
> I'm going to tell you what I have to prove. I have to prove that on a certain date, here in San Pat[ricio County], that these individuals [Vasquez and Brian], then and there, intentionally or knowingly, by act or omission, caused serious bodily injury to Justin, a child younger than 14 years of age by failing to seek medical treatment for blunt force trauma. They failed to seek treatment. That failure is what caused [Justin's] serious bodily injury and eventually death. In this case, I've got to prove why they have this duty, what makes Martha Vasquez have to do this for this child. Well, she assumed care, custody[,] or control of him.
>
> . . . .
>
> Justin would be here today if he had gone to the emergency room in enough time for doctors to help him. He would be here. You don't have to die from this.
>
> . . . .
>
> Whichever way you cut it, that baby died and they waited 13 to 15 and a half hours to call the 9-1-1 or they waited 9 to 12 hours to call 9-1-1.
>
> Now, ladies and gentlemen, if they're willing to wait anywhere from 9 to 15 and a half hours to call the police after he's died, what makes you think they were willing to take him to the doctor before then?

Vasquez does not clearly and explicitly argue why the prosecutor's closing argument

was impermissible such that her trial counsel should have objected. *See* TEX. R. APP.

P. 38.1(i). We surmise from Vasquez's appellate brief that she believes that the

31

prosecutor's comments were inflammatory and urged the jury to convict without holding the State to its burden of proving that Vasquez intended to cause Justin serious bodily injury.

Based on our review of the State's entire closing argument, we believe that the statements made by the prosecutor were permissible in that they responded to various defensive theories asserted and focused the jury's attention on the evidence adduced at trial, while discouraging the jury to speculate about evidence not offered. *See Brown*, 270 S.W.3d at 570; *Berry*, 233 S.W.3d at 859. Moreover, through her closing argument, the prosecutor informed the jury of the contents of the indictment and informed the jurors that they could convict Vasquez by finding that she either intended to cause serious bodily injury to Justin by omission or was aware that her omission was reasonably certain to cause the injury. *See Johnston v. State*, 150 S.W.3d 630, 636 (Tex. App.–Austin 2004, no pet.); *Dusek v. State*, 978 S.W.2d 129, 134 (Tex. App.– Austin 1998, pet. ref'd). Because we are to view the State's entire closing argument to determine error rather than reviewing certain statements in isolation, we cannot say that the prosecutor's statements were impermissible. *See Brown*, 270 S.W.3d at 570; *Berry*, 233 S.W.3d at 859; *Wilson*, 938 S.W.2d at 61; *see also Ozuna*, 199 S.W.3d at 613. Therefore, an objection to these statements likely would not have succeeded. *See Brown*, 270 S.W.3d at 570; *Berry*, 233 S.W.3d at 859; *Wilson*, 938 S.W.2d at 61; *see also Ozuna*, 199 S.W.3d at 613. As a result, Vasquez has not satisfied her burden of proving that trial counsel provided ineffective assistance by failing to object to the prosecutor's closing argument. *See Strickland*, 466 U.S. at 684 (1984); *Dewberry*, 4 S.W.3d at 757; *Jaynes,* 216 S.W.3d at 851. We overrule Vasquez's second issue.

## IV. THE SUFFICIENCY OF THE EVIDENCE

In her third issue, Vasquez argues that the evidence supporting Vasquez's conviction is legally and factually insufficient under the jury charge that should have been submitted. We disagree.

### A. Standard of Review

The court of criminal appeals has recently held that there is "no meaningful distinction between the *Jackson v. Virginia* legal sufficiency standard and the *Clewis* [*v. State*] factual-sufficiency standard" and that the *Jackson* standard "is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Brooks v. State*, 323 S.W.3d 893, 902-03, 912 (Tex. 2010) (plurality opinion). Accordingly, we review Vasquez's claims of evidentiary sufficiency under "a rigorous and proper application" of the *Jackson* standard of review. *Id.* at 906-07, 912.

Under the *Jackson* standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see Brooks*, 323 S.W.3d at 898-99 (characterizing the *Jackson* standard as: "Considering all of the evidence in the light most favorable to the verdict, was a jury rationally justified in finding guilt beyond a reasonable doubt"). "[T]he fact[-]finder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." *Jackson*, 443 U.S. at 319 (emphasis in original); *see also* TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979) ("The jury, in all cases is the exclusive judge of facts proved and the weight to be given to the testimony . . . .");

33

*Wesbrook*, 29 S.W.3d at 111 ("The jury is the exclusive judge of the credibility of witnesses and of the weight to be given testimony, and it is also the exclusive province of the jury to reconcile conflicts in the evidence.").

Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Curry v. State*, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000); *Adi v. State*, 94 S.W.3d 124, 131 (Tex. App.–Corpus Christi 2002, pet. ref'd). "'Such a charge [is] one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof, or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). The law as authorized by the indictment means the statutory elements of the charged offense as modified by the charging instrument. *See Curry*, 30 S.W.3d at 404.

### B. Applicable Law

Under the Texas Penal Code, "[a] person commits an offense [of injury to a child] if he intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes to a child . . . serious bodily injury. . . ." TEX. PENAL CODE ANN. § 22.04(a)(1); *Jefferson v. State*, 189 S.W.3d 305, 312 (Tex. Crim. App. 2006). A child is a person fourteen years of age or younger. TEX. PENAL CODE ANN. § 22.04(c)(1). "'Serious bodily injury' means bodily injury that creates a substantial risk of death or that causes death . . . ." *Id.* § 1.07(a)(46) (Vernon Supp. 2010).

"'[A]ct or omission' constitutes the means of committing the course of conduct element of injury to a child." *Jefferson*, 189 S.W.3d at 312. "Injury to a child by omission is a 'result of conduct' offense." *Williams v. State*, 294 S.W.3d 674, 684 (Tex. App.–Houston [1st Dist.] 2009, pet. ref'd). "[T]he essential element or focus of the statute is the result of the defendant's conduct (in this case, serious bodily injury to a child) and not the possible combinations of conduct that cause the result." *Jefferson*, 189 S.W.3d at 312; *see Alvarado*, 704 S.W.2d at 39 (stating that because the injury-to-a-child statute does not specify the "nature of conduct," the conduct is inconsequential to its commission as long as "the conduct (whatever it may be) is done with the required culpability to effect the *result* the Legislature has specified") (emphasis in original).

The evidence is sufficient to support Vasquez's conviction for injury to a child by omission under section 22.04(a) of the penal code if the State proves either that she intended to cause the injury through her omission or that she was aware that her omission was reasonably certain to cause the injury. *Johnston*, 150 S.W.3d at 636; *Dusek*, 978 S.W.2d at 134. The jury may infer both knowledge and intent from any facts that tend to prove the existence of these mental states, including the defendant's acts, words, or conduct and from the nature of the wounds inflicted on the victim. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002). The requisite culpable mental state may also be inferred from the surrounding circumstances. *Ledesma v. State*, 677 S.W.2d 529, 531 (Tex. Crim. App. 1984).

## C. Discussion

Dr. Fernandez testified that there was "trauma to [Justin's] abdomen, causing the tearing inside the abdomen; causing bleeding inside the abdomen; causing the fluid and

the inflammation to build up in the abdomen." Dr. Fernandez opined that Justin would have likely survived his injuries had he received medical treatment earlier. The evidence is clear that Vasquez did not seek medical treatment for Justin. Thus, a rational jury could reasonably conclude that Justin suffered serious bodily injury as a result of Vasquez's failure to seek medical treatment for him.

Dr. Fernandez also testified that "blunt force abdominal injuries" were the cause of Justin's death but that some of the bruising on Justin's face and chest could have resulted from the life-sustaining measures taken by medical staff. However, Dr. Mustafa noted that Justin's abdominal injuries could not have been caused by the medical staff's efforts to save Justin's life. Moreover, Dr. Harper testified that the bruising on Justin's body was "not consistent with normal childhood activity"; rather, it was "consistent with physical abuse." She stated that "the majority of Justin's bruises are from direct impact and trauma."

Several witnesses testified that Vasquez cared for Justin throughout the day of November 6, while Brian was at work. Furthermore, Angelica noted that Brian gave Justin a bath on the night before his death, and when Vasquez brought Justin into the bathroom and interrupted Greer's shower, Justin was wearing only a diaper. Thus, a rational jury could reasonably conclude that Vasquez would have seen the bruises to Justin's lower abdomen as well as the numerous other bruises and abrasions on Justin's body. Several medical experts testified that most of Justin's bruises were not fresh and were not caused by a blood disorder or meningitis. A rational jury could reasonably conclude that because Vasquez knew Justin threw up many times from November 6-7, knew that he was sick, knew that his stomach hurt, knew that he had

36

bruises to his lower abdomen and other parts of his body, and knew Justin had "labored" breathing and was "breathing real heavy through his nose" the following morning, Vasquez knew that Justin suffered some type of blunt-force trauma that required medical treatment.

The record contains ample testimony from witnesses showing that Vasquez was aware of Justin's medical condition and that she refused to take him to the hospital for fear that a bruise on his body would be discovered or because she allegedly failed to qualify for Medicaid. In fact, when told that Driscoll Children's Hospital in Corpus receives all patients regardless of insurance status, Vasquez still refused to take Justin for medical treatment. Nevertheless, on the evening of November 6, when Justin's condition took a turn for the worse, Greer overheard Vasquez and Brian state that they would take Justin to the doctor "in the morning if he's not doing any better." Unfortunately, Vasquez and Brian waited too late, as Dr. Fernandez testified that Justin likely died in the evening hours of November 6. In addition, Pierce testified that Vasquez told her that she would not take Justin to have various injuries examined because "she was afraid that hospital staff would see a bruise on [Justin's] leg and report it to C.P.S." Though this evidence supports a conclusion that Vasquez's objective in failing to provide medical treatment to Justin was to avoid detection of physical abuse rather than to inflict injury upon Justin, it also shows that Vasquez was aware of Justin's medical condition and the need to take him to the hospital. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) (noting that attempts to conceal incriminating evidence is probative of wrongful conduct and is also a circumstance of guilt). Several witnesses described Justin's appearance on November

6 as sad and pale, yet Vasquez still declined to seek medical treatment for Justin. Justin's sad and sickly appearance, stomach ache, continuous vomiting, extensive bruising to his body, and labored breathing on the morning of his death provide ample evidence to support the jury's determination that Vasquez was aware that her failure to provide medical treatment to Justin for his blunt-force trauma injuries was reasonably certain to cause serious bodily injury. *See Johnston*, 150 S.W.3d at 636 (stating that although the evidence leads to the conclusion that defendant's "objective in failing to provide medical care was to avoid detection rather than inflict injury upon [the child], it also shows that [defendant] was aware of [the child's] dire medical condition and the need to take him to the hospital"); *see also Guevara*, 152 S.W.3d at 50 (stating that "[m]otive is a significant circumstance indicating guilt"). Moreover, at various points during this case, Vasquez made inconsistent statements regarding Justin's physical condition. For example, Vasquez called Pierce on November 9, 2007, noting that Justin's autopsy "came back clean" and that Justin had "no bruises," even though the autopsy pictures showed numerous bruises and abrasions on Justin's body. Vasquez also had varying explanations for the bruises on Justin's body. Inconsistent statements are probative of wrongful conduct and are also a circumstance of guilt. *Guevara*, 152 S.W.3d at 50.

Viewing the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found the essential elements of serious bodily injury to a child by omission beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319; *see also Brooks*, 323 S.W.3d at 902-03, 912. Thus, we hold that there is sufficient evidence

to support the jury's verdict that Vasquez intentionally or knowingly caused serious bodily injury to Justin by omission. Accordingly, we overrule Vasquez's third issue.

### V. Conclusion

Having overruled all of Vasquez's issues on appeal, we affirm the judgment of the trial court.

_____
ROGELIO VALDEZ
Chief Justice

Do not publish.
Tex. R. App. P. 47.2(b)
Delivered and filed the
31st day of January, 2011.